HAROLD A. and ANITA B. TURNEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Turney v. Commissioner
Docket No. 38952-85.
United States Tax Court
T.C. Memo 1987-74; 1987 Tax Ct. Memo LEXIS 70; 53 T.C.M. (CCH) 80; T.C.M. (RIA) 87074; February 9, 1987. Harold A. Turney, pro so. Debra K. Moe, for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined deficiencies in petitioners' 1980 and 1981 Federal income tax in the amounts of $4,175.00 and $3,444.00, respectively. The issues for decision are as follows: (1) Was petitioner [1] required to include in income disability retirement payments received during 1980 and 1981? (2) If so, do respondent's prior assurances to petitioner that this income was not taxable, and petitioner's reliance thereon, estop respondent from now determining the deficiencies in tax? (3) *72 If respondent is not so estopped, is petitioner entitled to elect the section 72(d)[2] annuity cost recovery method with respect to these amounts? FINDINGS OF FACT Most of the facts have been stipulated and are so found. The stipulation of facts and related exhibits are incorporated herein by this reference. Petitioners, husband and wife, resided in San Jose, Calif., at the time of filing the petition in this case. They timely filed Federal income tax returns for 1980 and 1981 with the Internal Revenue Service Center in Fresno, Calif.
Petitioner was a civilian employee of the United States Department of the Army until September 24, 1976, when he retired on disability. Petitioner was 57 years old at the date of his retirement. During the years in issue petitioner had not yet reached age 65. Mandatory retirement age for petitioner was age 70. During his employment with the Army, petitioner contributed $20,084 to the Civil Service Retirement System, all attributable to retirement benefits. *73 Following his retirement he received annuity payments as follows: Year
Amount
1976
$1,751
1977
10,989
1978
11,664
1979
12,735
1980
14,400
1981
15,945
When petitioner retired, he was advised to go to his local Internal Revenue Service office to discuss any questions he might have regarding his disability retirement annuity. He complied with the advice and met with a representative of respondent who reviewed petitioner's discharge papers and medical documents. The Internal Revenue Service representative informed petitioner that he would not be taxed on the disability annuity until he reached age 65, the normal retirement age. At 65, the representative advised, he would begin drawing his regular pension and would at that time have taxable income. In early 1981, petitioner received a letter from respondent stating that there appeared to be a discrepancy in his 1978 taxes and asking him to contact respondent's San Jose office. Petitioner did so, and met with a different individual. This second representative concurred in the opinion given by the first representative in 1976. Petitioner was again informed that his retirement income was not taxable until *74 age 65. Respondent's representative also advised petitioner that he might be selected for examination every year due to respondent's computer program, but that petitioner should give the same explanation and would have no problem. Following this examination, in a letter dated March 17, 1981, respondent informed petitioners that the examination of their 1978 tax return showed "no change" and that the return was accepted as filed. Pursuant to the advice received from respondent in 1976, and again in 1981, petitioners did not report the disability retirement income on their income tax returns. Other income received by petitioners was reported. [3] Petitioners further relied on respondent's advice in structuring their financial affairs. Petitioners pay all bills currently and do not enter into debt; they therefore budget their income carefully. In light of respondent's opinion as to the non-taxability of the disability payments, petitioners considered that income to be available for current expenditures. Petitioners did not set aside money for the possible payment of back taxes and interest. *75 Petitioner was again contacted by the Internal Revenue Service in 1983, and this time met with a different representative of the San Jose office. This time he was told that he had been wrongly advised by the two previous representatives, and that the disability annuity was taxable income. Petitioner was told that he owed taxes and interest on the disability payments from 1976 through 1983, [4] but, because he had followed the advice of respondent's representatives, there would be no additions to tax. After he was informed that he had to pay tax on his disability income, approximately in May 1984, petitioner requested that he be able to use the three-year annuity cost recovery method for retirees (which he referred to as the "Golden Rule"). Petitioner made this request first to the auditor and later to the Appeals Officer and District *76 Counsel attorney. He was told this method was not available to him for the years 1980 and 1981, because the annuity had not been reported in 1976 through 1979. Respondent's position was that petitioner's contributions were already recovered in 1976 through 1979, and that he was therefore "deemed" to have elected the three-year cost recovery method for those years. On August 12, 1985, respondent issued a notice of deficiency to petitioners with respect to the years 1980 and 1981. The notice of deficiency stated that the disability income received by petitioner in 1980 and 1981, in the amounts of $14,400 and $15,945, respectively, had not been reported. Further, petitioners were not eligible for the disability income exclusion due to income limitations. OPINION The first issue to decide is whether petitioner was required to include in gross income his disability retirement pay received during 1980 and 1981. On two occasions, in 1976 and in 1981, respondent considered this question and concluded that this income was not taxable to petitioner until he reached age 65. Petitioner did not turn 65 unil 1984. However, respondent reconsidered his earlier opinion and now takes the *77 position that the disability payments are taxable income. Petitioner received Civil Service disability retirement payments in 1980 and 1981, at a time when he had not yet attained age 65 or the mandatory retirement age. His disability payments accordingly qualify as wage continuation payments (sick pay) under section 105(d). Brownholtz v. Commissioner,71 T.C. 332, 335 (1978); DePaolis v. Commissioner,69 T.C. 283, 286-287 (1977). While section 72(d)[5] normally applies to retirement annuities, the general rule [6] is that it does not apply to an amount received as an accident or health benefit while the taxpayer has not yet attained age 65. [7] The tax treatment of such amount is determined under sections 104 and 105. Sec. 105(d)(6); sec. 1.72-15(b), Income Tax Regs. The amounts received by petitioner are excludible only to the extent they are attributable to his own contributions, under section 104(d)(3). Those benefits received which *78 are attributable to employer contributions are includible in gross income under section 105(a), except to the extent they can be excluded under section 105(d). *79 In this case petitioner's contributions to the Civil Service Retirement System were towards retirement and not disability benefits. The disability payments he received during the years at issue were attributable to his employer's contributions. He therefore must include his disability income in gross income, pursuant to section 105(a). Section 105(d), however, provides for a limited exclusion from gross income in the case of amounts received as wages or in lieu of wages for a period during which an employee, under age 65, could not work because of permanent and total disability. This exception is limited to $100 per week; further, the excludible amount is reduced dollar-for-dollar by the amount by which the taxpayer's adjusted gross income exceeds $15,000. Petitioners' adjusted gross income in 1980, as reported on their Form 1040A, was $21,531.00. Their correct adjusted gross income, including the $14,400 of disability income, should have been $35,931. Since the maximum allowable exclusion is $5,200 ($100 per week), but petitioners' adjusted gross income exceeds $15,000 by $20,931, *80 petitioners are not entitled to any disability income exclusion in 1980. Likewise, in 1981 petitioners' adjusted gross income was too high to afford them the benefits of the section 105(d) exclusion. Their 1981 return reported adjusted gross income of $8,806.72. Their correct adjusted gross income, including the $15,945 of unreported disability income, was $24,751.72. This figure exceeds $15,000 by $9,751.72, which is again more than $5,200 and thus their disability income exclusion for 1981 is zero. Petitioner was clearly misinformed by the Internal Revenue Service representatives with whom he met in 1976 and 1981; as the above indicates, all of the disability income received by petitioner prior to attaining age 65 was taxable income except to the extent it could be excluded under section 105(d). [8] As noted above, petitioners' earnings during the years at issue made the section 105(d) exclusion unavailable for their use. The advice given petitioner by respondent regarding the nontaxability of his disability *81 income was incorrect when given. Petitioner followed this advice and did not include the income in his gross income year after year. We must now decide if respondent should be estopped from determining deficiencies in income tax based on petitioners' failure to report the disability income in 1980 and 1981. While the doctrine of estoppel is applied to the Government and its officials with great caution, in proper circumstances it does apply. Simmons v. United States,308 F.2d 938 (5th Cir. 1962); Vestal v. Commissioner,152 F.2d 132 (D.C. Cir. 1945), revg. 4 T.C. 558 (1945). The traditional elements of equitable estoppel are not present in this case. These elements are: (1) Conduct constituting a representation of material fact; (2) Actual or imputed knowledge of such fact by the representor; (3) Ignorance of the fact by the representee; (4) Actual or imputed expectation by the representor that the representee will act in reliance upon *82 the representation; (5) Actual reliance thereon; and (6) Detriment on the part of the representee. Consolidated Freightways, Inc. v. Commissioner,74 T.C. 768, 791 n. 8 (1980), affd. and revd. on other issues 708 F.2d 1385 (9th Cir. 1983); Graff v. Commissioner,74 T.C. 743, 761 (1980), affd. per curiam 673 F.2d 784 (5th Cir. 1982). [9]
In this case, respondent's error was a mistake of law by respondent's agents, not a misrepresentation of fact. It is well settled that the Commissioner may retroactively correct a mistake of law, Automobile Club of Michigan v. Commissioner,353 U.S. 180 (1957), even where the taxpayer has relied to his detriment on the Commissioner's mistake. Dixon v. United States,381 U.S. 68 (1965). Similarly, the Commissioner may challenge in a succeeding year the treatment of *83 an item that he allowed in an earlier year. Hawkins v. Commissioner,713 F.2d 347 (8th Cir. 1983), affg. a Memorandum Opinion of this Court; Coors v. Commissioner,60 T.C. 368 (1973), affd. 519 F.2d 1280 (10th Cir. 1975); Rose v. Commissioner,55 T.C. 28 (1970). Moreover, this case involves erroneous legal advice given a taxpayer by employees of the Commissioner. Under those circumstances, the Commissioner is generally not bound by the actions of his employees. See Fortugno v. Commissioner,41 T.C. 316 (1963), affd. 353 F.2d 429 (3d Cir. 1965); Schuster v. Commissioner,312 F.2d 311 (9th Cir. 1962), affg. in part and revg. in part 32 T.C. 998 and 32 T.C. 1017 (1959); Vestal v. Commissioner,supra.
However, there are exceptions to the general rule that the Commissioner may correct a mistake of law. Under a quasi-estoppel or abuse *84 of discretion theory, the Commissioner has been estopped from changing a position with respect to a taxpayer where a great injustice or unconscionable result would follow. Such cases have generally involved the following elements: (1) A misrepresentation by a representative of the United States, acting within the scope of his duties; (2) The absence of contrary knowledge by the taxpayer, in circumstances where the taxpayer may reasonably act in reliance upon the representation; (3) actual reliance; (4) detriment; and (5) a factual context in which the denial of equitable relief would be unconscionable. New York Athletic Supply Co., Inc. v. United States,450 F. Supp 469, 471 (S.D.N.Y. 1978). [10]
We note that the Ninth Circuit, to which this case is appealable, has considered the notions of justice and fair play in determining whether the Government should be estopped from correcting a mistake of law. United States v. Wharton,514 F.2d 406 (9th Cir. 1975); Fox v. Morton,505 F.2d 254 (9th Cir. 1974); United States v. Lazy FC Ranch,481 F.2d 985 (9th Cir. 1973); *85 Schuster v. Commissioner,supra.
In order for respondent to be estopped from correcting a mistake of law, the equitable interest of the party asserting estoppel must be "compelling", and the loss which he would sustain must be "unwarrantable" and "unconscionable." Schuster v. Commissioner,supra at 317-318; Estate of Emerson v. Commissioner,67 T.C. 612, 618 (1977). In this case, we sympathize with petitioner, but we do not believe this case is one in which it is proper to estop respondent from correcting his mistake. Petitioner has received the benefits of respondent's mistake of law. From 1976 through 1983 he treated his disability retirement income as nontaxable. The statute of limitations has run on the years 1976 through 1979, and petitioner is now being held accountable for taxes due on this income in 1980 and 1981. [11] As the income should properly have been included in gross income when received, this does not strike us as an unconscionable, unjust result which cries out for relief. *86 In addition, while we accept Mr. Turney's testimony that he always prefers to avoid debt, and did not structure his affairs so as to allow for the payment of taxes on this income, we do not find that this amounts to such "detrimental reliance" which would compel us to grant relief. Petitioner has not proved that he has suffered any real and substantial loss as a result of respondent's erroneous advice. Cf. Graff v. Commissioner,supra.The opinion regarding the taxability of the income was sought after petitioner retired, and respondent's advice can therefore not be considered to be petitioner's motivation for retiring early. [12] Indeed, petitioner benefited financially from respondent's legal error, as he did not pay tax on this income from 1976 through 1979. [13]
*87 Accordingly, we hold that respondent is not estopped from determining a deficiency in petitioner's income tax based on the unreported disability retirement income. We next turn to the question whether petitioner may elect the three year cost recovery method for the disability retirement annuity he received during 1980 and 1981. See sec. 72(d). As noted previously, where disability payments are received in lieu of wages, sections 104 and 105 apply rather than section 72. However, a taxpayer may waive his right to the section 105(d) disability income exclusion, and instead elect the section 72(d) annuity cost recovery method. Sec. 105(d)(6). This election, if made, is an irrevocable waiver of the right to claim the disability income exclusion in the taxable year for which the election is made and in each taxable year thereafter. The election is made by means of a statement attached to the taxpayer's income tax return, or amended return, for the taxable year in which the taxpayer wishes to begin annuity cost recovery. Sec. 7.105-1, Q & A-19, Temporary Income Tax Regs., 41 Fed. Reg. 56631 *88 (Dec. 29, 1976). In this case, Mr. Turney made no election to report his disability annuity using the cost recovery method on either his 1980 or 1981 return, or on any earlier returns, nor has he filed any amended returns for those years containing any such election. Indeed, this fact was considered by this Court in making our determination that the disability payments should have been included in income, and that respondent's initial advice to the contrary was incorrect. The record indicates, however, that once petitioner was informed by respondent that this income was taxable, he requested that he be permitted to use the three year cost recovery method, and was repeatedly told he could not. Rather than allow petitioner to amend his 1980 return (or advise him of the proper method to do so), respondent persisted in the claim that because petitioner did not properly report this income since 1976, he should be "deemed" to have made the election in 1977, [14] and thus should be deemed to have recovered his cost in 1977 through 1979. Respondent maintained this position at trial as well. *89 We do not agree with respondent's argument. The election to waive the section 105(d) disability income exclusion, and instead report the annuity pursuant to section 72(d), is clearly an affirmative election by a taxpayer. Mr. Turney never made any election with respect to 1977, 1978 or 1979, and we will not impute any such election to him. These years are closed. With respect to the years 1980 and 1981, respondent argues that since no formal election of section 72(d) treatment was made on petitioner's return, the three-year annuity cost recovery method is unavailable to him. Again, we disagree with respondent's conclusion. Section 105(d)(6) does not provide that the election must be on a return but provides that the taxpayer must make an "irrevocable election." [15] The procedure for making the election is set forth in respondent's regulations, which require a statement attached to a tax return or amended return. In this case, petitioner has not filed such a statement with his return. However, this Court has repeatedly held that literal compliance with the procedural directions *90 in Treasury regulations on making elections is not required; substantial compliance may suffice where the essential statutory purposes have been fulfilled. See American Air Filter Co. v. Commissioner,81 T.C. 709 (1983); Tipps v. Commissioner,74 T.C. 458 (1980); Hewlett-Packard Co. v. Commissioner,67 T.C. 736 (1977). What is required is evidence of an affirmative intent on the taxpayer's part to make the required election and be bound thereby. Atlantic Veneer Corporation v. Commissioner,85 T.C. 1075 (1985). The facts of this case lead us to conclude that petitioner has indicated an affirmative intent to make the election under section 105(d)(6) for years beginning in 1980, and to be bound by such election. Such intent was repeatedly communicated to respondent's auditor, Appeals Officer, and District Counsel attorney, beginning in May, 1984 [16] and continuing up until the time of trial; the evidence *91 shows that despite respondent's insistence that petitioner had already "elected" the three-year cost recovery rule for earlier years, petitioner continued to assert his position that he could elect it as of 1980. Petitioner adhered to this position in his petition to this Court, his trial memorandum, and his trial testimony. We find that petitioner clearly intended to make this election, and committed himself to be bound by its consequences. Compare Valdes v. Commissioner,60 T.C. 910 (1973). He has therefore complied with the essential purpose of the statute, that of an irrevocable election of the benefits of section 72(d), and a waiver of the benefits of section 105(d). The three-year annuity cost recovery rule is therefore applicable to the disability annuity income received by petitioner during the years at issue. Petitioner's contributions to his retirement plan totalled $20,084. He received $14,400 during 1980 and $15,945 during 1981. After recovery of employee contributions, $10,261 of *92 the amount received in 1981 is a taxable annuity. Accordingly, Decision will be entered under Rule 155.
Footnotes
1. References to "petitioner" will be to Harold A. Turney. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue.↩
3. Petitioners' returns for 1976 through 1979 are not part of the record. Petitioners' 1980 and 1981 returns show adjusted gross income of $21,531.00 and $8,806.72, respectively.↩
4. The Internal Revenue Service representative with whom petitioner spoke conceded from the outset that the years 1976 through 1979 were barred by the statute of limitations. Petitioner had not yet received a notice of deficiency for 1982 and 1983 at the time of trial, although adjustments to income had been proposed based on the same issue.↩
5. In pertinent part, sec. 72(d) reads as follows: (1) Employee's contributions recoverable in 3 years - Where - (A) part of the consideration for an annuity, endowment, or life insurance contract is contributed by the employer, and (B) during the 3-year period beginning on the the date on which an amount is first received under the contract as an annuity, the aggregate amount receivable by the employee under the terms of the contract is equal to or greater than the consideration for the contract contributed by the employee, then all amounts received as an annuity under the contract shall be excluded from gross income until there has been so excluded an amount equal to the consideration for the contract contributed by the employee. Thereafter all amounts so received under the contract shall be included in gross income. ↩
6. The general rule applies unless the taxpayer makes an election under sec. 105(d)(6). We are assuming for now that no sec. 105(d)(6)↩ election has been made. 7. In this situation, the "annuity starting date" under sec. 72(d) begins in the taxable year in which the taxpayer attains age 65 or his mandatory retirement age, if earlier. Sec. 105(d)(6); sec. 1.105-4(a)(3), Income Tax Regs.; sec. 7.105-1, Q & A-4, Temporary Income Tax Regs., 41 Fed. Reg. 56630↩ (December 29, 1976).
8. We note that in 1976, when petitioner first sought advice from respondent, the sick pay exclusion then in effect under sec. 105(d)↩ provided different limitations.
9. See also T. Lynn & M. Gerson, "Quasi-Estoppel & Abuse of Discretion as Applied Against the United States in Federal Tax Controversies," 19 Tax L. Rev. 487, 488↩ (1964).
10. See also T. Lynn and M. Gerson, supra↩ at 488-489.
11. As noted above, the 1982 and 1983 tax years are still under review by the Internal Revenue Service.↩
12. Compare United States v. Lazy FC Ranch,481 F.2d 985↩ (9th Cir. 1973). 13. We do not mean to imply that petitioner is better off for having received and followed respondent's erroneous advice. On the contrary, we feel strongly that this taxpayer's case has been mishandled by respondent, and we understand that he feels injured and victimized. Despite lifelong efforts to avoid debt, and despite his best intentions, petitioner now faces a potential debt of several thousand dollars at a time in life when his earning capacity is at its lowest. In a legal sense, however, we cannot find the sort of "detrimental reliance" or "unjust result" which would be necessary to estop respondent from collecting the taxes due.↩
14. Sec. 105(d)(7) (redesignated sec. 105(d)(6)↩) was added by the Tax Reform Act of 1976 to provide for the election of the three-year annuity cost recovery provisions by early disability retirees. The new provision was generally effective for years beginning after Dec. 31, 1976, except for certain exceptions not relevant to petitioner herein. Sec. 505, Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1566, as amended by sec. 301, Tax Reduction and Simplification Act of 1977, Pub. L. 95-30, 91 Stat. 126. We assume that respondent refers to 1977 as the first year in which he would "deem" Mr. Turney to have made an election for this reason.
15. Compare sec. 168(f)(4), in which the procedure for making an election is set forth in the statute. See DeMarco v. Commissioner,87 T.C. 518↩ (1986), on appeal (1st Cir., Jan. 15, 1987).
16. We note that this was the first opportunity petitioner had to make this election, as this was the first time he was informed that the income was reportable.↩